Where statutes declare that proceedings shall be void, he was inclined to think they should be considered absolutely void either in law or equity. The Acts of 1786, c. 20, and 1787, c. 23, enact that when grants shall be obtained on younger entries to the prejudice of older ones, such grants shall be void and utterly of no effect. The circumstances disclosing the avoidance, he was of opinion, might be shown in a court of law as well as in equity, in the single case of an older entry under these two statutes.
The grant to Sevier was read; the counsel for the plaintiff excepted to the opinion of the Court on the ground of the first ten objections, and a writ of error prayed to remove the cause to the Supreme Court of the United States.
Verdict for the defendants.
ORIGINAL NOTE. — In the Supreme Court of the United States, at February term, 1815, the first five exceptions were determined in favor of the defendants. In relation to the sixth, seventh, eighth, and ninth exceptions, the Supreme Court of the United States says, "They present one general question of great importance to landholders in the State of Tennessee. It is-this. Is it in any, and if in any in what, cases allowable in an ejectment to impeach a grant from the State for causes anterior to its being issued?
"In cases depending on the statutes of a State, and more especially respecting titles to land, this court adopts the construction of the State where that construction is settled and can he ascertained. But it is not understood that the courts of Tennessee have decided any other point bearing *Page 158 
on the subject than this, — that under their statutes declaring an older grant founded on a younger entry to be void, the priority of entries is examinable at law, and that a junior patent founded on a prior entry shall prevail, in an ejectment, against a senior patent founded on a junior entry.[1] The question whether there are other cases in which a party may, at law, go beyond the patent for the purpose of avoiding it remains undecided.
"The laws for the sale of public lands provide many guards to secure the regularity of grants, to protect the incipient rights of individuals, and also to protect the State from imposition. Officers are appointed to superintend the business, and rules are framed describing their duty. These rules are in general directory, and when all the proceedings are completed by a patent issued by the authority of the State, a compliance with these rules is presumed. That every prerequisite has been performed is an inference properly deducible, and which any man has a right to draw from the existence of the grant itself. It would therefore be extremely unreasonable to avoid a grant in any court for irregularities in the conduct of those who are appointed by the government to supervise the progressive course of a title, from its, commencement to its consummation in a grant.
"But there are some things so essential to the validity of the contract that the great principles of justice and of law would be violated did there not exist some tribunal to which an injured party might appeal, and in which the means by which an older patent title was acquired might be examined.
"In general, a court of equity appears to be a tribunal better adapted to this object than a court of law. On an ejectment, the pleadings give no notice of those latent defects of which the party means to avail himself; and, should he be allowed to use them, the holder of the elder grant might often be surprised. But in equity the specific points must be brought into view; the various circumstances connected with those points are considered, and all the testimony respecting them may be laid before the Court. The defects in the title are the particular objects of investigation, and the decision of a court in the last resort is *Page 159 
decisive. The Court, on a view of the whole case, may annex equitable conditions to its decree, or order what may be reasonable, without absolutely avoiding a whole grant.[1] In the general, then, a court of equity is the more eligible tribunal for these questions, and they ought to be excluded from a court of law. But there are cases in which a grant is absolutely void, as where the State has no title to the thing granted, or where the officer had no authority to issue the grant. In such cases the validity of the grant is necessarily examined at law.
"Having premised these general principles, the Court will proceed to consider the exceptions to the opinion of the Circuit Court, in this case, and the testimony rejected by that opinion.
"The case does not present distinct exceptions to be considered separately, but a single exception to a single opinion, rejecting the whole testimony offered by the plaintiff. The plaintiff offered to prove that no entries ever were made authorizing the issuing of the warrants on which the grant to Sevier was founded, and that the warrants themselves were forgeries. He also offered to prove that, at the time of the cession to Congress of the territory in which these lands lie, the warrants did not exist, nor were there any locations in the office from which they purport to have issued to justify their issuing.
"The Act of 1777, which opens the land office and directs the appointment of an officer in each county, denominated an entry taker, to receive entries of all vacant lands in his county, directs the entry taker, if the land shall not be claimed by some other person within three months, to deliver to the party a copy of the entry, with its proper number, and an order to the county surveyor to survey the same. This order is called a warrant.
"The ninth section of the act then declares that every right, c., by any person or persons set up or pretended to any of the before-mentioned lands which shall not be obtained in manner by this act directed, or by purchase or inheritance from some person or persons becoming proprietors by virtue thereof, or which shall be obtained in fraud, evasion, or elusion of the provisions and restrictions thereof, shall be deemed and are hereby declared utterly void.
"The Act of 1783, which again opens the land office, appoints an entry taker for the Western District, and prescribes *Page 160 
rules for making entries in his office, and for granting warrants similar to those which had been framed for the government of the respective counties.
"In the year 1789, North Carolina ceded to Congress the territory in which the lands lie for which Sevier's grant was made, reserving, however, all existing rights under the State, which were to be perfected according to the laws of North Carolina. This cession was accepted by Congress.
"Sevier's survey is dated on the 26th day of May, 1795; the lands for which the warrants were granted, by virtue of which the survey was made, lie within the district of country for which the land office was opened by the Act of 1777. Had the survey been made on the land originally claimed by these warrants, it must have been a case directly within the ninth section of the act, and the right is declared by that section utterly void.
"But the survey was made on different lands by virtue of an act which empowers the surveyor so to do in all cases of lands previously appropriated. This clause in the law however, does not authorize a survey where no entry has been made; and such survey also would come completely within the ninth section. In such case there is no power in the agent of the State to make the grant, and a grant so obtained is declared to be void.
"This subject is placed in a very strong point of view by considering it in connection with the cession made to the United States. After that cession, the State of North Carolina had no power to sell an acre of land within the ceded territory; no right could be acquired under the laws of that State but the right to perfect incipient titles. The fact that this title accrued before the cession does not appear on the face of the grant. It is, of course, open to examination. The survey was not made until May, 1795, many years posterior to the cession. It purports, however, to have been made by virtue of certain warrants founded on entries which may have been made before the cession. But if these warrants had no existence at the time of the cession; if there were no entries to justify them, what right could this grantee have had at the time of the cession? The Court can perceive none; and, if none existed, the grant is void for *Page 161 
want of power in the State of North Carolina to make it.[1] If, as the plaintiff offered to prove, the entries were never made, and the warrants were forgeries, then no right accrued under the Act of 1777, and independent of the Act of Cession to the United States, the grant is void by the express words of the law.[2] "If entries were made in the county of "Washington, but no commencement of right had taken place in the ceded territory, previous to the cession, so as to bring the party within the reservation contained within the Act of Cession, then the grant must be void, there being no authority in the grantor to make it. In rejecting testimony to these points, the Circuit Court erred, and their judgment must be reversed, and the cause remanded for a new trial." *Page 162 
[EDITORS' NOTE: THIS PAGE CONTAINED FOOTNOTES.] *Page 163 
NOTE. — See Polk's Lessee v. Wendell, 5 Wheat. 306, where the position assumed in this note is commented on. See, also, Polkv. Windel, infra, 433, where this case is retried in U. S. Circuit Court. — ED.
[1] The Supreme Court of North Carolina had repeatedly decided differently, but particularly in 1 N. C. L. R. 383, in the year 1814.
[1] 4 A.L.J. 1; Vincent's Lessee v. Conrad, acc.
[1] How is the fact to be ascertained is the question. The entry book of Washington county, where these entries were made is lost, and no accurate account of the entries made can be had. The warrants filed in the secretary's office are the only authentic evidence; parol evidence, it is presumed, will not be admitted in opposition to a State grant. Once admitted there would be an end of every thing like certainty in land titles, which has been conceived essential in every country. See Laws of North Carolina, 1795, c. 17, § 10; 1798, c. 4, § 2; Laws of Tennessee, 1801, c. 4.
[2] The idea that a grant under such circumstances, independently of the Act of Cession, is void, formed a question which has been frequently decided in North Carolina and this State, and uniformly directly the reverse of that expressed by the Supreme Court of the United States. The opinion of the Supreme Court, proceeding on general principles, expressly recognizes the idea that, after the issuance of a grant all prerequisites are to be presumed; an entry is one of these prerequisites; and this is conformable to a current of authority without an exception. See 1 Hay. 359; 1 North Carolina Law Repository, 383.
The Act of 1777, c. 1, of which the ninth section is a part, requires many preparatory steps to be taken by the officers of government, such as that a warrant should issue, sworn chain carriers, the land marked all round, c. If the persons intrusted by government to do these things fail to take these steps in some instances, will the grants be void? It is believed not, though prima facie the ninth section would make them so.
It may not be amiss further to observe that by legal presumption entries made in the county entry taker's office, for Washington county, the warrants for which were surveyed before the issuance of Sevier's grant, must have been made, and consequently the commencement of right, previous to the Cession Act, as the office was shut in April, 1784, c. 12, § 3, Ird. 481.
The whole weight of this case seems to rest on the want of authority in the State of North Carolina to issue the grant to Sevier agreeably to the provisions of the Cession Act, thereby affecting a third interest; namely, that of the United States. Admitting for the sake of argument this to be correct, still an embarrassment remains in ascertaining what kind of evidence will be received to show this want of authority or of entries. To pursue the practice in North Carolina and Tennessee, no evidence whatever in such case would be received. "Where a grant once issues for a tract of vacant land, it becomes the only evidence of title, and we cannot afterwards look further back than the grant." 1 Hay. 359.
This is the principle which has uniformly been pursued both in North Carolina and Tennessee, with the single exception of receiving the evidence of entries to show the commencement of titles in the latter State. It is submitted whether that part of the Act of 1777, which requires an entry is not directory, and whether a failure therein shall prejudice the grantee. Suppose a person puts in his location, which is on a slip of paper, and pays his money, it is the duty of the entry taker to copy this location in a bound book, and then it is called an entry. Let it be further supposed that the entry taker does not enter it on the book, and that he has previously issued a warrant on it. He afterwards loses or mislays the location whereby he is prevented from making the entry; a grant however issues; shall the grantee lose his land? Surely not.
It is admitted in the opinion of the Supreme Court of the United States, "that all existing rights under the State of North Carolina were to be perfected according to the laws of that State," agreeably to the Act of Cession to the United States. After the issuance of a grant, the laws of North Carolina, evidenced by the decisions of their courts,presume all prerequisites to the issuing of a grant to have been complied with; therefore, quœre, for it cannot be seen how the circumstances of this case can withdraw it from the general principles laid down by the Supreme Court of the United States in the following words: "These rules (in relation to the issuing of grants) are in general directory, and when all the proceedings are completed by a patent issued by the authority of the State, a compliance with these rules is presumed. That every prerequisite has been performed is an inference properly deducible, and which any man has a right to draw from the existence of the grant itself." See the case of Sevier Anderson v. Hill, ante, acc.
These are the general principles recognized and acted on without exception (the State of Tennessee furnishing a solitary one as above) by both States. It is certainly a question involving the dearest interests of the people of Tennessee, whether the federal courts should not proceed by the same rules in relation to such high and important rights of property. No doubt exists but that they will so proceed when State decisions are made known as being settled.
As, by the cession of North Carolina to Congress in the year 1789, land claims are to be perfected agreeably to the laws of that State, it cannot be seen how, or upon what solid ground the federal courts can judge of those claims upon the principles other than those established by long usage, and the decision of the State courts. See 5 Cr. 22, 32, 33, 221, 222, 225; 6 Cr. 165; 1 North Carolina Law Repository, 431.
Beside the confusion and distress that must arise from such departure in relation to land titles, it would seem difficult to reconcile it with that uniform respect which the federal courts have ever shown for State decisions; with the above provisions of the Cession Act; as well as a fair presumption, founded in the comity of sovereign States, that North Carolina in issuing grants, after
as well as before the cession acted bonâ fide.